UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x
                                                   :
United States of America                           :
                                                   :
            - v -                                  :          18-Cr-32 (S-2) (ARR)
                                                   :
MICHAEL CRUMBLE,                                   :
                                                   :
                          Defendant.               :
-------------------------------------------------- x


**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**


KANNAN SUNDARAM
Federal Defenders of New York, Inc.
One Pierrepont Plaza
Brooklyn, New York 11201
(646) 588-8311


TO:     Keith D. Edelman
        Lindsay K. Gertes
        Assistant U.S. Attorneys
        271 Cadman Plaza East
        Brooklyn, New York 11201

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

The defendant, Michael Crumble, through counsel, respectfully moves this Court for an order reducing his sentence to time served based on the "extraordinary and compelling reasons" discussed below, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

As the Second Circuit has now made clear, the First Step Act allows district courts "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). Here, those reasons include:

1.  The COVID-19 pandemic, which puts Mr. Crumble's health in grave danger, as he suffers from chronic kidney disease, hypertension, asthma, and prediabetes.  There is currently a massive outbreak throughout the Bureau of Prisons, and the facility where Mr. Crumble is incarcerated, FCI Schuylkill is at the forefront, with 204 active COVID cases among inmates and counting, a huge recent upswing at the facility, which reported no active cases just four weeks ago.

2.  The conditions of confinement since the onset of the pandemic have been excessively punitive, with no opportunity for Mr. Crumble to engage in the positive programming designed to assist with reentry.

3.  Despite this, Mr. Crumble has spent his incarceration as productively as possible, working regularly and doing everything he can to prepare for his reentry into the community.  In addition to his work, Mr. Crumble has taken dozens of classes, and completed a drug treatment program.  In short, Mr. Crumble is rehabilitated.

4.  Mr. Crumble has a concrete and attainable plan for his reentry into the community, including a safe home to return to, where he can better protect himself from the pandemic,

2

and a number of excellent job opportunities already lined up. Mr. Crumble has maintained

close contact with his loving family, who cannot wait for him to return home, including a

son who was 16 years old when Mr. Crumble was first incarcerated on this case, and is

now 28 years old, with a child of his own.

    Here, there are extraordinary and compelling reasons to reduce Mr. Crumble's sentence,

and after reviewing the factors set forth at 18 U.S.C. § 3553(a), the Court should find that Mr.

Crumble's release would comport with the purposes of sentencing. For these reasons and those set

forth below, the Court should reduce Mr. Crumble's sentence to a term of time-served.

## FACTUAL BACKGROUND

### A.    Procedural History

    Michael Crumble was arrested on February 6, 2018, and has been incarcerated since that

date.  Initially, the government charged Mr. Crumble, Ramel Markus and an unnamed

third co-defendant – later revealed to be Tyrone Burch – with kidnapping and kidnapping

conspiracy, (18 U.S.C. §§ 1201 (a), (c)), Hobbs Act extortion and Hobbs Act extortion conspiracy

(18 U.S.C. § 1951(a)), and using, carrying and possessing a firearm in connection with each of

those offenses (18 U.S.C. §924(c)).  Shortly after being arrested and disclosed as the initially

unnamed defendant, Burch pled guilty under a cooperation agreement.

    Although Mr. Crumble wished to pursue plea negotiations before a trial date was set, a trial

date was set early on because co-defendant Markus requested a trial.  Eager to plead guilty and

avoid a trial, Mr. Crumble engaged in additional plea negotiations and the government offered a

second plea agreement with an estimated Guidelines range substantially lower than the first one,

and than the Guidelines range that would apply after a trial conviction.  The government extended

that plea offer to both defendants, but made it contingent on both of them accepting it. Mr.

3

Crumble accepted the offer, but Mr. Markus did not.

Defense counsel made repeated entreaties to the government to allow Mr. Crumble to accept its plea offer without regard to Mr. Markus's decision, but the government refused. Faced with the choice of pleading to the entire indictment or going to trial, Mr. Crumble reluctantly went to trial.  On the eve of trial the government, in response to Mr. Crumble's motion to dismiss the § 924(c) count on the ground that there was no qualifying predicate crime of violence, superseded with a new indictment replacing the extortion counts with a count of committing physical violence in furtherance of an extortion (18 U.S.C. § 1951(a)), and predicating the § 924(c) count on that offense and not the kidnapping offenses.

The evidence at trial centered on the abduction and extortion of Daniel Nieves, a drug trafficker, for the purpose of obtaining his narcotics and drug proceeds.  In the course of the abduction and extortion, Nieves was repeatedly hit in the face with a gun, had a glass broken on his face and had his arms burned with a hot iron.  It was co-defendant Markus who pistol-whipped Nieves in the head, tried to suffocate him with a glass of water and then smashed the glass on his head.  PSR ¶ 37.  It was cooperator Burch who pointed a gun at Nieves face and later burned his arms with a hot iron.  PSR ¶ 31.  Crumble for his part "assisted Burch in forcing Nieves into the SUV, and was present and participated throughout the entire conspiracy" [PSR ¶ 26] but did not himself engage in any assaultive conduct, and no evidence suggested that he intended, agreed to or even foresaw the sudden, violent actions taken by Markus and Burch.

After trial, Mr. Crumble was convicted of the substituted extortion offense as well as the kidnapping and kidnapping conspiracy counts, but the jury acquitted him of using, carrying and possessing a firearm in connection with the extortion offense.

At his sentencing Mr. Crumble said he regretted participating in these crimes and

4

apologized to Mr. Nieves: "I've been thinking about that day and I regret that day deeply.  I just want to apologize to Nieves and I want to say I'm very, very sorry that the pain that he went through and for me being a part of it, and I know what I did was wrong and I will never, ever let anyone influence me to commit any crimes ever again in my life."  Sentencing Tr. at 18:23 – 19:4.

Mr. Crumble also spoke about the toll his incarceration at the MDC has taken on himself and his family:

> This last year residing at MDC Brooklyn has been tearing not only me apart, but my family apart.  Seeing my children grow up without me has been depressing.  A one-hour visit [] once a month is terrible.  The C.O.'s follow outdated policies which prevents physical contact between an inmate and their child, it's stressful for both the children and the parents.  It has come to a point where my mother has told my fiancé not to bring my children because they cry and make a scene because I can't hold them.  Mikey, the four-year-old's favorite question to ask [] when he visits is: Dad, when are you leaving work?  Why don't you take me to school anymore?  Can you leave with me for two minutes?

> At that moment, how do you tell a four-year-old, no, due to the fact his father is in jail?  My incarceration has deeply scarred my son, to the point where he has tantrums in school because he wants me.  I vowed that day never to abandon my children again, never to abandon my fiancé, my family.  [*Id.* at 19:8 – 20:2] … It's been very overwhelming, [] this last year-and-a-half for me, [] speaking to my kids on the phone, speaking to my wife.  Just the other day, [] my wife was telling me about he's graduating coming up, and he was taking pictures.  So, you know, she has the phone [] on speaker, so I hear him.  He's talking and he's like – the big question comes again:  Dad, when are you coming home?  And it just like – it deeply hurts me, deeply, deeply hurts me to tell him that I'm not gonna be there.  I'm not gonna be there.  *Id.* at 21:21 – 22:5.

Before imposing sentence, the Court noted that though "it is true that defendant proceeded to trial, disqualifying him from acceptance of responsibility within the meaning of the guidelines[,] [n]onetheless, the Government apparently does not dispute the defendant wanted to accept a Government plea offer to charges with guidelines calculated at approximately ten years, but he was unable to do so because that offer was extended on the condition of a global plea and his co-defendant Markus was determined to proceed to trial.  I have also considered the defendant's statement that I do believe demonstrates sincere remorse for his conduct."  *Id.* at 27:2–4.

The Court also found mitigation in Mr. Crumble's family circumstances, noting that "[F]or

5

the past several years he has been in a relationship with a fiancé with whom he has two very young children, now ages two and four" and that letters from his family, "and especially that of his fiancé, explore the closeness of his relationship with her and the children and the extent and nature of their dependence on him." *Id.* at 27:14–21.  The Court sentenced Mr. Crumble to 108 months (9 years) custody and 5 years supervised release. *Id.* at p. 28:4- 7; *see* ECF Nos. 164, 170.

On April 19, 2020, Mr. Crumble requested the Bureau of Prisons to move for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), based on his concern about being exposed to and contracting COVID-19 in prison.  The warden of FCI Schuylkill, where Mr. Crumble is incarcerated, denied the request, stating that Mr. Crumble's "concern about being potentially exposed to, or possibly contracting COVID-19 does not currently warrant an early release from your sentence.  It should be noted at this time, FCI Schuylkill does not have any confirmed COVID-19 staff or inmate cases." *See* Ex. A, "Inmate Request to Staff Response," dated May 1, 2020.  On May 13, 2020, Mr. Crumble filed an administrative appeal to the Warden's denial of compassionate release, requesting that the Warden reconsider his decision and release Mr. Crumble to home confinement.  The Warden's office received the request May 14, 2020, and denied it on May 18, 2020. *See* Ex. A, "Request for Administrative Remedy" and "Inmate Request to Staff Response" p. 2, dated May 18, 2020.

### B.   Mr. Crumble's Incarceratory Experience

*1.   The Covid-19 pandemic threatens Mr. Crumble's life and health.*

Since the beginning of the pandemic, courts have recognized the grave danger that COVID-19 poses to incarcerated individuals. *See e.g United States v. Gentille*, 19 Cr. 590 (KPF), WL 1814158, at *3 (Apr. 9, 2020) (describing the spate of 3582(c)(1)(A) motions from defendants "who are understandably worried about (and at particular medical risk for) contracting

COVID-19 . . . recognizing the speed with which the virus spreads, the impracticability of social

distancing in federal prison, and the marked deficiencies in hygiene and medical care."); *see also*

*United States v. Haney*, 2020 WL 1821988, at *6 (S.D.N.Y. Apr. 13, 2020) ("[C]onditions of

confinement—sharing small cells, eating together, using the same bathrooms and sinks, delays in

medical evaluation and treatment, and rationed access to soap—make prisons more potentially

conducive to the transmission of COVID-19 than elsewhere."); *United States v. Skelos*, 2020 WL

1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("Jails and prison are powder kegs for infection. People

in jails and prisons cannot practice social distancing, control their exposure to large groups,

practice increased hygiene, wear protective clothing, obtain specific products for cleaning and

laundry, avoid frequently touched surfaces, or sanitize their own environment."); *United States v.*

*Canale*, No. 17-CR-286 (JPO), 2020 WL 1809287, at *1 (S.D.N.Y. Apr. 9, 2020) ("[I]t is beyond

dispute that COVID-19 is much more easily transmitted, and is thus particularly dangerous, in the

prison environment.").

Nine months into the pandemic, however, the dangers from COVID-19 continue to grow

exponentially, and, as recently described by Senators Elizabeth Warren and Richard J. Durbin,

there is "mounting evidence that efforts to contain the virus within BOP facilities are failing":

> Since the date of Director Carvajal's testimony [on June 2, 2020, BOP
> Director Carvajal testified before the Senate Judiciary Committee about the BOP's
> "robust" response to the pandemic], the virus has spread to almost every BOP
> institution and dozens of federal halfway houses. At least 133 inmates and two staff
> members have died due to the coronavirus, and these deaths have occurred in more
> than 40 facilities. Almost 17,000 inmates and staff have tested positive since the
> pandemic began and currently there are active cases at more than 150 BOP
> institutions and halfway houses. More than 50 facilities currently have more than
> five active inmate or staff cases, which is undoubtedly a "significant presence," given
> the ease with which this disease spreads. Based on BOP statistics, the rate of
> infection within BOP remains nearly four and a half times higher than in the general
> population.

*See* Letter of Senators Warren and Durbin to Attorney General Barr and Director Carvajal, dated

October 2, 2020, p. 2, attached as Exhibit B.

In the close to three months that have passed since Senators Warren and Durbin sounded that alarm, things have gotten even worse. Much worse. A little over a week ago the Marshall Project announced: *"One in every five state and federal prisoners in the United States has tested positive for the coronavirus, a rate more than four times as high as the general population*. … As the pandemic enters its tenth month – and as the first Americans began to receive a long-awaited COVID-19 vaccine – at least 275,000 prisoners have been infected, more than 1,700 have died and *the spread of the virus behind bars shows no sign of slowing. New cases in prisons this week reached their highest level since testing began in the spring, far outstripping previous peaks in April and August."* Ex. D, "1 in 5 Prisoners in the U.S. Has Had COVID-19 (Compared to 1 in 20 in the general population.)," *The Marshall Project* (emphasis added), *https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-us-has-had-covid19*.[1]

Illustrating this, data collected by the Marshall Project and the Associated Press show that "[b]y Dec. 15, at least 276,235 people in prison had tested positive for the illness, *a 10 percent increase from the week before. New infections this weak reached their highest level since the start of the pandemic. The latest surge has far outpaced the previous peak in early August.*" Ex. C, "A State-by-State Look at Coronavirus in Prisons," *The Marshall* Project (emphasis added). *https://themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.*

---

[1] And according to Homer Venters, the former chief medical officer at Rikers Island, "That number is a vast undercount." Ex. D, p. 1. "Venters has conducted more than a dozen court-ordered COVID-19 prison inspections around the country and said, "I still encounter prisons and jails where, when people get sick, not only are they not tested but they don't receive care. So they get much sicker than need be." *Id.*

FCI Schuylkill, where Mr. Crumble is incarcerated, conforms to this alarming trend and appears to be on track to become the next Fort Dix. According to the BOP's own statistics, Schuylkill currently has 206 active inmate cases – the sixth highest of any BOP facility -- and 13 active staff cases, with only 2 inmates and 5 staff members it categorizes as having "recovered" from COVID-19." This number represents an explosion of cases in recent days and weeks, up from 160 active inmate cases a few days ago and not a single one until less than a month ago, reporting its first positive case on December 4, 2020. *See United States v. Leon*, 18-cr-237 (VB) (S.D.N.Y.), Gov. Mem. in Opp. To Defendant's Mot. for Sentence Reduction, ECF No. 100, Filed 11/23/20 at 12 ("In FCI Schuylkill, there are currently *no* active cases of COVID-19, and nobody has tested positive in the last seven days.") (emphasis in original); *see also* Ex. M, Graph of Current COVID-19 Positive Incarcerated People at Schuylkill FCI as of 2020-12-28. And while the government touted Schuylkill's 1.6% positive testing rate in that late November filing, that rate has since shot up to a startling 32.4% -- 187 out of 577 – as of today, which exceeds by several orders of magnitude the positive testing rate in New York City, where Mr. Crumble will reside with his family if released. *See* BOP ; *see also* Ex. M, Graph of COVID-19 Tests of Incarcerated People at Schuylkill FCI as of 2020-12-28.

Prisons are simply the worst places to be during this deadly pandemic: inmates do not have any control over their environment. and social distancing "is virtually impossible to maintain inside prison facilities absent substantial population reductions, but DOJ and BOP continue to make only minimal use of its authority to release inmates to home confinement." Ex. B, p. 2. Other than doing everything he can to protect himself, Mr. Crumble has no power to enforce mask-wearing among other inmates or guards, or to remain socially distanced, or to ensure that others people wash their hands, clean shared surfaces, or do any of the other essential practices

for surviving this pandemic.  Indeed, concerned about the specter of contracting the coronavirus from the numerous staff members not wearing masks, Mr. Crumble has complained about this to them and to the warden, and his complaints have been greeted with hostility or silence.  *See* Ex. F, Emails from Michael Crumble to Warden Scott Finely; Ex. G, Letter to the Court from Michael Crumble at 2, 3, 5.

> a.  *Mr. Crumble's array of health conditions makes him particularly vulnerable to COVID-19.*

Mr. Crumble currently suffers from an array of health problems, including chronic kidney disease, asthma, hypertension, and prediabetes.  *See* Ex. I, BOP Health Service, "Health Problems," at 1; Ex. J, BOP Health Services "Clinical Encounter," at 1 (6/25/20) and 5 - 7 (6/17/20)   His active prescriptions include an Albuterol inhaler for his asthma and three different medications for his hypertension:  Hydrochlorothiazide, one 25 MG tablet each morning; Lisinopril, one 20 MG tablet each day; and Metoprolol Tartrate, one-half tablet (12.5 MG) twice a day.  *See* Ex. I at 2 – 4.

Metoprolol "is also used to treat chest pain (angina) and to improve survival after a heart attack."  https://www.webmd.com/drugs/2/drug-11207/metoprolol-tartrate-oral/details.  Mr. Crumble has also had a history of chest pain during his time in BOP custody [Ex. I at 1], and his medical history predating his February 2018 incarceration includes an aortic/pulmonic murmur, occasional palpitations, a right atrial enlargement and a 40% blood flow to his right atrium.  *See* Ex. K, Records from Albany Family Medicine at 2, 3, 6, 7.

> b.  *The conditions of confinement during the COVID-19 pandemic are extraordinarily difficult.*

The onset of the COVID-19 pandemic has led to extra-punitive deprivations for Mr. Crumble. After enduring a miserable 18 months at the MDC Brooklyn – the latter part including

the 4-month-long power outage during the brutally cold winter and spring of 2019 – he was designated to FCI Schuylkill in the late summer of 2019. *See* Ex. G at 1 – 2. Mr. Crumble's attached letter to the Court encapsulates his relief upon leaving the MDC Brooklyn – where he had been "push[ed] to a trial that [he] did not want, confined in a tuna can in M.D.C. 120 inmates overlapped on each other, Haven't been in the sun for 18 months, having to be lockdown, No Hot water, No lights, eating cold food push[ed] me to smoking synthetic marijuana to escape the reality in front of me" -- and arriving at FCI Schuylkill: "Finally able to go outside. Get fresh air. Sun beaming, working food service, going to church, exercising, doing programs, working on my return goals," Ex. G at 1 - 2, which include starting a non-profit organization devoted to serving the youth in his community. See Ex. H at 3.

Mr. Crumble's relief upon arriving at Schuylkill was short-lived: "Then boom the pandemic hits we go on lockdown for 4 months back to no going outside. No fresh air, No visits, One phone call. Now back to the same frustration I endured at M.D.C. being mentally frustrated." Ex. G at 2. Mr. Crumble has been under lockdown conditions since the spring of 2020, which has meant that he is allowed out only for very brief periods, often less than an hour a day, during which he has to try to do such things as shower, contact his family, and exercise. All of the positive programming that Mr. Crumble had started, including taking classes, has been cancelled. And COVID-19, an invisible, potentially fatal disease, adds a layer of fear and paranoia to what, under the best of circumstances, is a difficult place to exist. Every inmate views the other as a potential source of disease or death, as asymptomatic individuals are potential carriers of the virus, and even symptomatic inmates have been known to hide their symptoms to avoid being sent into solitary confinement. *See* Ex. B at 2 (concerning use of solitary confinement during the pandemic). Being incarcerated has never been easy, but the current conditions of confinement for Mr. Crumble are extraordinarily difficult and

unnecessarily punitive.

>c.    *Mr. Crumble has rehabilitated and prepared for a successful reentry into the community.*

The above-described circumstances, which were completely beyond his control, have prevented Mr. Crumble from availing himself of the work and programming opportunities offered by the BOP during normal times.  For 18 months he was stuck in pretrial detention at the MDC, deprived of the work and programming opportunities available in BOP prisons, and about a quarter of that time was in lockdown due to the power outage during the first few months of 2019.  And this despite his fervent wish to plead guilty from the outset of the case, which was foiled by the government's insistence on making Mr. Crumble's plea offer contingent on co-defendant Markus's decision.  And though the trial came quickly enough, the sentencing did not; a year passed between the verdict and sentencing, and this too because of a decision by Markus, this time his post-trial decision to substitute counsel, which delayed his PSR and the joint sentencing of both defendants.

Despite being stuck at the MDC for that duration, Mr. Crumble, fueled by the determination to make things right with his family and to prepare for his eventual return to the community, spent his time as productively as he could.

While at the MDC, he attended church and group meetings with other inmates where he could express his feelings about various issues relating to incarceration.  Sentencing Tr. at 20:3 – 6.  As he explains in a letter to the Court, during and owing to his incarceration within the BOP Mr. Crumble has reconnected with the Church, and has specific plans to continue that when he returns to the community:

>Growing up in a Baptist home, I was in church numerous times a week with my grandmother, so I always had a connection with God, but for some reason, I fell astray.  God has opened my eyes and ears during this incarceration again to pick up

his word and lead my life in a new direction.  Since this incarceration I have devoted any time getting connected back with the word (Gods word) and in tune with my life desires.  When I return home, I'm going to become a member of my fiance'[s] grandmother's and mother's church, Dewitt.  They have been members for 40 yrs, 50 yrs.  That's going to be the beginning of my new journey of giving back to the community.  The church is located on Columbia in Baruch Housing development.  Saturdays and Sundays I'll be committed to church service, getting out in the community, talking to residents, getting to know the community at hand.  Promoting love, peace, happiness and God's word.

Ex. H at 1 – 2.

Knowing that there are many seniors in the church and community, Mr. Crumble plans to initiate a monthly "breakfast for seniors starting once a month they come together eat breakfast, drink coffee, tea then after breakfast an activity like Bingo for enjoyment." *Id.* at 2.  Mr. Crumble also plans to "start a men's group.  We come together weekly to express our feelings, thoughts, read scriptures, drink coffee.  I believe and have put a lot of prayer and thought into achieving this as my short term goal and believe this is a reality I can bring forth with hard work and dedication." *Id.*

While at the MDC, Mr. Crumble also participated in group meetings "to debate the issues regarding prison reform, facilities and policies[,]" and completed a class on alternatives to drug dealing, receiving a certificate that enables him to "continue to teach that program once [he's] housed an another facility or once home."  Sentencing Tr. at 20:3-9.  As he related to the Court at his sentencing, "My goal is to make it [as] popular or equal to NA or AA because a lot of black men coming from my community [don't] have programs [of] that nature in our community.  Coming from one of the worst neighborhoods in Brooklyn, stricken [sic] by poverty, I had slowly but surely turned into a product of my environment.  Being a black man coming from a single-parent household, I was accustomed to seeing what the rapper has or drug dealer has.  Your Honor, I want to use my experience, my life experience and my mistakes, to

13

help individuals who are walking down the path of destruction." *Id.* at 20:10-20.

Over the course of his incarceration after leaving the MDC, Mr. Crumble's goals have taken focus, and developed into a more concrete plan to start a neighborhood youth program. As he tells the Court in a letter he wrote from Schuylkill:

> My long term goal is starting my own non-profit servicing the community with a pantry, programs for kids engaging in sports activities, fighting obesity, stay healthy and big brother, big sister mentoring program. I also want to pick up stop gun violence. As you know, my younger brother was killed by gun violence. I want to do prison reform, promoting staying out of prison. Cause I know how it feels to be stuck in one. Lonely, depress[ed] and how it affects your kids if you have any and damage[s] families." Ex. H at 3.

*See* Ex. L at 1, Sonya Crumble Letter ("Michael has been discussing his goals to assist me in starting a non profit organization to feed the homeless, programs for teens to decrease obesity, and afterschool programs.").

After the Court announced the 9-year sentence it was imposing, Mr. Crumble, who was focused on continuing to provide financial assistance to his family, asked the Court to recommend that the BOP designate him to a facility that has the UNICOR work program. *See* Sentencing Tr. at 30:2-9. The Court obliged, recommending designation at one of the specific facilities requested by counsel and further recommending Mr. Crumble for employment in UNICOR. *See* ECF No. 170, Judgment. Due to the onset of COVID-19, however, this too fell by the wayside, as Mr. Crumble was not at FCI Schuylkill for a long enough period to engage in UNICOR or complete other programming before they were shut down due to the pandemic.

### 2.    Mr. Crumble has a strong and concrete reentry plan.

When Mr. Crumble is released, he plans to live in the Bronx with his fiancé and long-time girlfriend Ebony Troche and their two young sons, now 5 and 3 years old. As Mr. Crumble and his fiancé have told the Court, she has struggled mightily to raise the two boys without their

father in their lives.  *See* ECF No. 147-1 at 2, Letter to the Court from Ebony Troche.  This was true at the time of his sentencing and is even more true in the difficult year and a half that has passed since then.  *See* Ex. G at 1, Letter to the Court from Michael Crumble ("My fiancé Ebony has taken the burden of being both parents, working hard to maintain our household, while still building a future for us, and most importantly making sure I get to know my kids."); Ex. L at 1, Letter to the Court from Sonya Crumble 1 ("He has spent a significant time caring for both children with their mother Ebony Troche.  The children miss him dearly and his incarceration has greatly impacted their lives.").

Though receiving little help from the BOP in terms of preparing for re-entry, Mr. Crumble has taken it upon himself to fashion a re-entry plan, in consultation with his aunt Petrina Wilson, a program analyst with the Department of Health and Human Services who works to provide training and technical assistance to federally funded programs that provide services to runaway and homeless at risk youth and has promised to everything she can to help connect him to education, job training and life skills programs "if he is given a second chance [] to rebuild his life[.]"  *See* Ex. L at 3, Letter to the Court from Petrina Wilson; Ex. H, Crumble Letter at 2-3.  From Monday through Friday Mr. Crumble will "be committed to attending [] Exodus, Osbourne job career and training program."  Ex. H at 2; *see*  Exodus Transitional Community, Inc., https://www.etcny.org/whatwedo; The Osborne Association, Osborne Career Center, http://www.osborneny.org/services/achieving-economic-independence/osborne-career-center/.  "When city jobs post online for M.T.A., D.E.P., Housing Authority," he tells the Court, "I'll be filling out applications to attain a position.  I was informed by family members employed with the city that they hire felons."  Ex. H at 2-3.[2]

---

[2] Although Mr. Crumble is clearly motivated and determined to succeed and has put together a

In addition to his family and extended family in New York City, Mr. Crumble continues to have the strong support of his mother, Sonya Crumble, who lives in Albany.  Stably employed as a clinical case manager in human services for the past 17 years, Ms. Crumble would provide her son with financial support until he is employed and would pay for weekly counseling sessions which she feels "will be beneficial in assisting him to construct how to manage his current health issues, continue to work on himself, work toward his goals and re-uniting with his wife and children to be a better husband and father." Ex. L at 1.  Though Mr. Crumble's preference would be to reside with his fiancé and children upon release, Mr. Crumble has also offered her home as an option and has a friend who is an employment specialist at a local city agency and believes he could help Mr. Crumble secure employment.  *See id.* at 2, Letter of Willie J. White, Senior Employment & Training Specialist, City of Albany Department of Youth and Workforce Services.

In sum, Mr. Crumble has a concrete and attainable plan for his reentry into the community: he has a safe place to stay where he can better protect himself from the pandemic, a number of promising training and employment prospects lined up, and a loving and supportive family awaiting his return.

## ARGUMENT

## I.    This Court Should Reduce Mr. Crumble's Sentence To Time Served.

Section 3582(c)(1)(A)(i) empowers this Court to reduce a person's sentence if

---

more than credible plan to do so, it should go without saying that he will also have the full resources of the Federal Defenders social workers at his disposal, which at the moment would include a dedicated social work intern from Columbia University's School of Social Work.

"extraordinary and compelling reasons" so warrant. Here, those reasons include: the danger of the COVID-19 pandemic given Mr. Crumble's serious medical conditions and the current and ongoing outbreak at the prison where he is incarcerated; the conditions of confinement since the onset of the pandemic, which are extra-punitive and provide no rehabilitative opportunities; Mr. Crumble's obvious progress toward rehabilitation despite those obstacles; and Mr. Crumble's strong prospects for a successful re-entry into the community. *See Brooker*, 976 F.3d at 237 (courts have "broad" discretion to reduce a sentence under 18 U.S.C. 3582(c)(1)(A), including "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release); *see also United States v. Rodriguez*, No. 3 Cr-271(AB), 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (considering inmate's health conditions, the danger of his remaining incarcerated, and his commendable rehabilitation in granting compassionate release).

### A.    Legal Framework

As amended by the First Step Act, § 3582(c)(1)(A)(i) provides that:

> the court, upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in § 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

In *Brooker*, the Second Circuit confirmed what many district court judges had already recognized, that U.S.S.G. § 1B1.13 Application Note 1(D), which "made the Bureau of Prisons

the sole arbiter of whether most reasons qualify as extraordinary and compelling," was not applicable to motions brought directly to the court by a defendant under the First Step Act. *Brooker*, 976 F.3d at 233. This Court can thus consider all of Mr. Crumble's personal circumstances, as well as the unprecedented public health crisis created by the COVID–19 pandemic, in deciding whether to reduce his sentence. *See id.* Mr. Crumble has satisfied the exhaustion requirement of § 3582(c)(1)(A)(i) by submitting a request to the Bureau of Prisons to move for a reduction of sentence, which was denied in May 2020. *See* Ex. B.

**B.    Mr. Crumble Has Demonstrated Extraordinary and Compelling Reasons Warranting a Reduction In Sentence.**

*1.    Mr. Crumble's pre-existing medical conditions amidst the COVID-19 pandemic and the current outbreak at his facility provides an extraordinary and compelling reason to reduce his sentence.*

As described above, and fully documented in the attached BOP medical records, Michael Crumble has several underlying health conditions that make him particularly vulnerable to the worst consequences of COVID-19 were he to become infected.  Mr. Crumble has chronic kidney disease, asthma, hypertension, and prediabetes.  *See* Ex. I, BOP Health Service, "Health Problems," at 1; Ex. J, BOP Health Services "Clinical Encounter," at 1 (6/25/20) and 5 - 7 (6/17/20)   His active prescriptions include an Albuterol inhaler for his asthma and three different medications for his hypertension, one of which is "is also used to treat chest pain (angina) and to improve survival after a heart attack." https://www.webmd.com/drugs/2/drug-11207/metoprolol-tartrate-oral/details.  Consistent with these conditions, and with a prior medical history that includes a heart murmur, occasional palpitations and a right atrial enlargement, Mr. Crumble has had a history of chest pain during his time at FCI Schuylkill.

Mr. Crumble's chronic kidney disease, by itself, places him in the CDC's highest risk category – "increased risk of *severe illness* from the virus that causes COVID-19" – in terms of heightened vulnerability

to the coronavirus.  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#chronic-kidney-disease;  "Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death."  *Id.*  There can be no serious question that having "medical conditions that place [the defendant] in the highest risk category with respect to the COVID-19 coronavirus" constitutes an "extraordinary and compelling reason" under the compassionate release act.  *See United States v. Plank*, 2020 WL 3618858, at *2 (D. Kansas, July 2, 2020).

Two of Mr. Crumble's other medical conditions, asthma and high blood pressure, place him in the next high-risk category of those who "might be at an increased risk for severe illness from the virus that causes COVID-19."   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.  The existence of multiple comorbidities further increases Mr. Crumble's risk: "The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."  *Id.*

As this Court and others have recognized, in the context of the COVID-19 pandemic any one of these conditions can qualify as an extraordinary and compelling reason within the meaning of the Compassionate Release Act.  As this Court stated even before *Brooker*'s holding that Guideline 1B1.13 does not apply to compassionate release motions brought by defendants, rather than by the BOP [*United States v. Harris*, 2020 WL 5801051 at *2 (S.D.N.Y., Sept. 29, 2020) (PAE); *see Brooker*, 576 F.3d at 236]:

> While the defendant's hypertension does not place him squarely within any of the Policy Statement's definitions of 'extraordinary and compelling reasons,' *see* USSG § 1B1.13 cmt. N.1(A)-(D), the defendant asserts that the COVID-19 pandemic, combined with his particular vulnerability to complications from COVID-19 because of his hypertension, constitutes an 'extraordinary and compelling reason' for his release.  Def.'s Mot. 10-11.  The government does not dispute this assertion, and I agree with the defendant that the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release.

*United States v. Sawicz*, 453 F. Supp.3d 601, 605 (E.D.N.Y. 2020); *see United States v. Brown*, 16-CR-326

(ARR), ECF No. 515 (E.D.N.Y. April 25, 2020) (granting compassionate release to defendant suffering from hypertension); *United States v. Separta*, 2020 WL 1910481 (S.D.N.Y. April 20, 2020) (hypertension).

 

Mr. Crumble not only has hypertension, but asthma and chronic kidney disease.  Because asthma significantly increases the risk of severe illness from COVID-19 [*see* CDC, *COVID-19, People With Certain Medical Conditions*, at https://bit.ly/35bAVtA (October 21, 2020)], courts within this Circuit have found it, too, to be an extraordinary and compelling reason warranting release. *See, e.g.*, *United States v. Benjamin*, 15 Cr. 445 (PAE), ECF No. 1144 at 5 (Sept. 15, 2020) (granting early release to inmate with asthma, explaining that "COVID-19 presents a heightened risk for incarcerated defendants like Benjamin with respiratory ailments such as asthma"); *see also United States v. Nicolas Cooper*, 13 Cr. 66 (JPO), ECF No. 36 (June 11, 2020) (same); *United States v. Williams*, 456 F. Supp. 3d 414, 417-418 (D. Conn. 2020) (same; collecting cases); *see also United States v. Asaro*, 2020 WL 1899221, at *6 (E.D.N.Y. April 17, 2020) (ARR) (citing *United States v. Hernandez*, 2020 WL 1684062, at *3 (S.D.N.Y., April 2, 2020), as "finding extraordinary and compelling reasons for release of inmate at high risk of serious illness from COVID-19 because of his asthma").

Further amplifying Mr. Crumble's risk to COVID-19 is his chronic kidney disease, which even by itself increases his risk for severe illness – that is, "hospitalization, admission to the ICU, intubation or mechanical ventilation, or death" – vis-à-vis COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#chronic-kidney-disease; *See United States v. Spencer*, 2020 WL 3893610 (S.D.N.Y. July 10, 2020) (PAE) (granting compassionate release to defendant with hypertension and chronic kidney disease, among other ailments).

The danger Mr. Crumble faces of severe illness from the coronavirus is exacerbated by

the BOP's halting response to the pandemic, and there is "mounting evidence that efforts to contain the virus within BOP facilities are failing." *See* Exhibit B.  FCI Schuylkill provides a stark example: it had no recorded positive cases just four weeks ago – a fact the Warden cited in denying Mr. Crumble's compassionate release request back in May, and the government cited in opposing a compassionate release motion late last month – and as of this writing it has 204.  A shocking 32.3% of inmates tested – nearly 1 out of 3 – have come back positive, dwarfing not only the 1 out of 20 (5%) rate in the population at large but even the 1 out of 5 (20%) in prisons across the nation.

One out of three is a truly harrying number for an inmate like Michael Crumble, whose myriad pre-existing health conditions threaten a host of serious complications were the coronavirus to find its way to him.  Sadly, he saw this coming, pleading with the CO's and even the warden to actually enforce the BOP's requirement that its staff wear masks, but no one at FCI Schuylkill took heed.  Now COVID-19 is raging at the facility, with 44 new active cases just yesterday, and Mr. Crumble is a sitting duck.  Given the pace of the outbreak which he is amidst, each day he spends in this facility "[puts] him at significant risk of suffering catastrophic health consequences." *Sawicz*, 453 F. Supp.3d at 604.  "The combination of [Mr. Crumble's condition, which gives him a particularly high risk of serious harm from the virus, and the especially severe outbreak at the facility, where measures to contain the virus have been ineffective, provides an extraordinary and compelling reason for relief in this case." *Plank*, 2020 WL 3618858, at *3.

      2.    *The extra-punitive conditions of confinement support early release.*

FCI Schuylkill, which is in the midst of a massive COVID-19 outbreak, is an extraordinarily difficult place to be incarcerated. From the onset of the pandemic in March 2020, Mr. Crumble has been subject to endless lockdowns, and has not been able to participate in any

positive activities.  Nor has he been able to see his family, as social visits have been suspended during the pandemic.  Currently, Mr. Crumble is enduring a complete lockdown since December 8, 2020, and thus has not been able to contact his family or even defense counsel for the past three weeks.

Throughout this entire time, the constantly looming threat of contracting and getting seriously ill from the coronavirus has taken a huge psychological and emotional toll on him.  As he has expressed to the Court:  "I have deep concerns for my health and eventually contracting this deadly virus."  Ex. G at 2.  "My biggest fear," he tells the Court, "is not making it out of here alive.  It's a very scary feeling to have.  Just know[ing] that I can contract COVID-19 become ill at high risk with all these health problems and to make matters worse I can't count on medical in this facility."  *Id.* at 4.

Completely isolated from his family and in fear for his life, Mr. Crumble's continued incarceration amounts to punishment beyond that which was intended by the Court or contemplated by the sentencing scheme. These conditions, unforeseeable at the time of sentencing, support early release from this prison sentence.  Once home, Mr. Crumble will be able to better protect himself from this deadly virus while laying the foundation for the second chapter of his life. Either as part of the "extraordinary and compelling" analysis or when reviewing the factors under 18 U.S.C. § 3553(a), the extra- punitive nature of Mr. Crumble's incarceration – which will continue for the foreseeable future – strongly supports early release.

> 3.      *Mr. Crumble has done everything he can to rehabilitate himself.*

While rehabilitation *alone* is not a sufficiently extraordinarily and compelling reason upon which to reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), *see* 28 U.S.C. 994(t), courts

regularly consider an individual's efforts and progress while incarcerated as a component of a such a request. *See e.g.*, *United States v. Stephenson*, 2020 WL 2566760, at *6 (S.D. Iowa May 21, 2020) (explaining that "[f]or the word "alone" to do any work—as it must—that means courts can consider rehabilitation as part of a compassionate release motion."); *United States v. Rodriguez*, No. 3 Cr-271(AB), 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (granting compassionate release motion based on a combination of the inmate's health conditions; the danger of his remaining incarcerated; and the fact that he had served most of sentence and had shown commendable rehabilitation.

As described above, Mr. Crumble's opportunities for rehabilitation through programs offered within the BOP have been stifled by circumstances beyond his control.  His fervent wish was to plead guilty and began serving his sentence, with a view towards working in the UNICOR program to send money to his family and availing himself of any other training opportunities to prepare for his eventual release.  But due to decisions made by others, over which he had no control – in this case the government and his co-defendant – he was stuck for an inordinate length of time in pretrial and then pre-sentence detention at the MDC, a jail facility with limited programming for inmates.  For a significant portion of that time, programming was shut down altogether due to a power outage that crippled the facility for months.

In the face of these limitations, Mr. Crumble endured and made the most of his time at the MDC.  He completed a class on alternatives to drug dealing and received a certificate that enables him to teach the program once housed at another facility or outside the prison system. He started attending church again, and participated in group meetings "to debate the issues regarding prison reform, facilities and policies."  Sentencing Tr. at 20:3-4.

Inspired by what he learned, about himself as well as about these issues that have

affected his life and the lives of his community both inside and outside of prison, Mr. Crumble resolved to do something about it, to dedicate his life after prison to helping others – and especially the young men in his poor, crime-ravaged community – avoid making the bad decisions that have landed him in prison and sidetracked his life with his family. Since continuing his incarceration at FCI Schuylkill, he has worked on his ideas and developed more concrete plans to start a non-profit with specific programs and activities geared to address the needs of young people in his neighborhood. As he also has a special affinity for the elderly borne of his close relationship with his grandmother, Mr. Crumble has formulated a similarly concrete plan to serve the seniors in his fiance's family's church, by hosting a monthly breakfast seniors to be followed by activities such as bingo.

Throughout his incarceration, Mr. Crumble has maintained close and productive ties with his family and friends despite often being incarcerated far from home. Mr. Crumble has taken advantage of the few opportunities he has had to put himself in a position to re-start his life the moment he is released. He is rehabilitated, and poised to succeed if given the opportunity.

4.   *Mr. Crumble has a viable reentry plan.*

Mr. Crumble has laid the groundwork for his successful reentry into the community by working hard throughout his incarceration, and maintaining close ties with his friends and family.   His mother Sonya Crumble, his aunt Petrina Winston and others have written to the court to describe both Mr. Crumble's close ties to his family and community and his excellent work prospects upon release. *See* letters to the Court, attached as Exhibit I. Mr. Crumble's singular focus throughout his incarceration has been to return to his family, secure a good job, and do everything he can to live the rest of his life in a positive and successful manner. While he has admittedly squandered too much of his young adulthood based on poor decisions, Mr.

24

Crumble is now 37 years old with two young children, and there is every reason to conclude –

based on his efforts while incarcerated, his letters to the Court, and his overall sincerity, which

did not escape the Court at sentencing – that he will take advantage of every opportunity

afforded to him, both while on supervised release and thereafter.

### C.   The § 3553(a) Considerations Are Consistent with, or Outweighed by, the Extraordinary and Compelling Reasons for Release

In evaluating Mr. Crumble's application for compassionate release, Section

3582(c)(1)(A)(i) instructs the Court to consider the "the factors set forth in § 3553(a) to the

extent that they are applicable[.]" The Court must also find that any reduction it imposes "is

consistent with applicable policy statements issued by the Sentencing Commission."  *Id.*

After the Second Circuit's decision in *Brooker*, however, Guideline 1B1.13 is no longer

part of the mix.  In *Brooker* the Court held that Guideline 1B1.13 applies only to compassionate

release motions brought by the BOP and "is not 'applicable' to compassionate release motions

brought by defendants[.]" *Brooker*, 576 F.3d at 236; *United States v. Harris*, 2020 WL 5801051,

at *2 (S.D.N.Y., Sept. 29, 2020) (PAE). "Consistent with *Booker*, when assessing a motion

brought directly by an imprisoned person rather than by the BOP, the Court is constrained

neither by U.S.S.G. 1B1.13's enumeration of extraordinary and compelling reasons, nor by its

freestanding requirement that the defendant seeking release not pose any danger to the

community."  *Harris*, 2020 WL 5801051, at *2. *Accord, United States v. Pellegrino*, _ F.3d __,

2020 WL 5820325, at *4 (S.D.N.Y., Sept. 30, 2020) (JS).

In the context of a § 3582 motion, the § 3553(a) factors should be assessed based on the

time of the motion rather than the time of the initial sentencing.  Looking at Mr. Crumble as he

stands before the Court now, those factors mostly align in support of his application.

For example, the Court must consider the need for the sentence "to provide the defendant

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §3553(a)(2)(D).  This factor strongly weighs in favor of Mr. Crumble's release on all fronts.   Manifestly, keeping a high-risk person incarcerated is not the "most effective manner" of mitigating the risk of his contracting COVID-19.  *See United States v. Connell*, _ Supp. 3d _, 2020 WL 2315858, at   *5 (N.D. Ca. May 8, 2020).

Releasing Mr. Crumble would also unquestionably provide him with needed education or vocational training in the most effective manner.  Under the lockdown conditions brought on by the pandemic, especially at FCI Schuylkill during the current outbreak, Mr. Crumble will continue to receive no training of any kind for the foreseeable future.  If released, on the other hand, he will be immersed in vocational training five days a week.

So too, the need to protect the public from further crimes [§ 3553(a)(2)(C)] will not be compromised by releasing Mr. Crumble at this juncture, and may in the long run be better served by it.  Mr. Crumble's strong re-entry plan, his recommitment to church, and his sincere determination to change his life, individually and collectively go a long way toward preventing him from recidivating.  More fundamentally, however, the extremely harsh conditions he has suffered in prison – lockdown conditions for over nine months and counting, with persistent, mounting and increasingly justified fears of getting deathly ill from the rapidly spreading coronavirus – has instilled in him a fear of being in prison unlike anything he has had before.  There is no good reason to think that Mr. Crumble, if given this rare and treasured opportunity for a second lease on life, would throw it all away for the sake of committing another crime.

Of course, the Court must also consider the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]" § 3553(a)(2)(A).  Mr. Crumble's offense was undeniably a serious one, but it is also

clear that Mr. Crumble has learned from it, grown from it and suffered from it immensely.  The

letters to the Court accurately describe a remorseful, family-oriented person who has learned his

lesson and is poised to take a different course if given the opportunity.  Importantly, the Court,

after seeing and hearing from Mr. Crumble at his sentencing, believed that he "demonstrates

sincere remorse for his conduct." Sentencing Tr. at 27:2-4.

 With respect to the issue of "just punishment," the Court should consider not only the

months and years Mr. Crumble has served but the conditions of confinement, which as

discussed have been extra-punitive and harsh beyond even the normal conditions of prison.

When that, too, is fully taken into account, we contend that additional incarceration is not

required for purposes of punishing Mr. Crumble.

 Thus, on balance we submit that, notwithstanding the admitted seriousness of Mr.

Crumble's offense, when *all* of the § 3553(a) factors are considered collectively they militate in

favor of granting his application for compassionate release.

 In any event, even if the Court were to conclude that the seriousness of the offense in

particular or the § 3553(a) factors in whole militate against release, it should then weigh those

factors against "the extraordinary and compelling reasons militating in favor of release[.]"  *See*

*Asaro*, 2020 WL 1899221, at *8.

 In *Asaro* this Court observed that the defendant, a lifetime member of the mafia, had lived

a life of violence and that his offense, though committed at age 77, amounted to a "senseless act

of violence" warranting an above-Guidelines sentence of 96 months, of which he had served 58

months.  *See id.*, at *7, 8.  Nonetheless, the Court granted the defendant's compassionate release

motion, stating that "I intended to impose an above-Guidelines sentence – not a death sentence."

*Id.*, at *8.  "If Asaro were to remain in detention," the Court concluded, "he would face a

significant risk of contracting – and suffering severe complications from, and perhaps even dying from – COVID-19.  I do not believe that continued detention, in light of this risk, is an appropriate or proportionate way to further the purposes of sentencing.  *See* § 3553(a)(2)."  *Id.*

Similarly, in *United States v. Sawicz*, the Court concluded: "While I acknowledge that possession of child pornography is a serious offense and that the defendant has already once violated the conditions of a term of supervised release, these considerations do not justify keeping the defendant in prison amidst an outbreak of a potentially deadly virus to which he is particularly vulnerable."  453 F.Supp.3d at 605-06.

As other courts have put it: "The severity of [Defendant's] conduct remains unchanged. What has changed, however, is the environment where [he] is serving his sentence." *Pellegrino*, _ F.Supp3d _, 2020 WL 5820325, at *4, quoting *United States v. Zukerman*, 451 F.Supp.3d 329, 336 (S.D.N.Y. 2020).  "When the Court sentenced [Defendant], the Court did not intend to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic." *Zukerman*, F.Supp.3d at 336 (quoting *United States v. Rodriguez*, 451 F.Supp.3d 392, 407 (E.D. Pa. 2020).

The same conclusion should obtain here.  Although the crime Mr. Crumble was convicted of is serious, that consideration, which cannot be changed, should not override all other factors and "do[es] "not justify keeping [him] in prison amidst an outbreak of a potentially deadly virus to which he is particularly vulnerable." *Sawicz*, 453 F.Supp.3d at 605-06.

**CONCLUSION**

For the reasons set forth above, the Court should grant Mr. Crumble's motion, reduce

his sentence to time served, and re-impose a term of supervised release of four years.

Dated:        New York, New York
              December 30, 2020


                                        /s/
                                        Kannan Sundaram
                                        Ass't Federal Defender
                                        (646) 588-8311


cc.     Keith D. Edelman
        Lindsay K. Gertes
        Assistant U.S. Attorneys